Banford C. COUNTS, Appellant,

v.

KANSAS CITY SOUTHERN RAILWAY COMPANY, a Corporation, Respondent.

No. 47701.

Supreme Court of Missouri, Division No. 1.

Nov. 14, 1960.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 12, 1960.

Ben W. Swofford, Laurence R. Smith, Phillip L. Waisblum, Kansas City, Jerrald O. Finney, Anderson, Ind., for appellant. Swofford, Smith & Waisblum, Kansas City, of counsel.

Richard S. Righter, Robert D. Youle, William H. Bates, Joseph E. Stevens, Jr., Kansas City, for respondent. Lathrop, Righter, Gordon & Parker, Kansas City, of counsel.

HOLMAN, Commissioner.

Action by plaintiff to recover damages in the amount of $200,000 for personal inju-

ries sustained when he was run over by a railroad car involved in a switch movement. The trial resulted in a verdict for defendant. Plaintiff has duly appealed from the ensuing judgment.

■ Upon this appeal plaintiff contends that Instructions No. 8 and No. 10 given at the request of defendant were prejudicially erroneous and that the court erred in refusing to give Instruction No. 20 requested by him which contained a submission under the humanitarian doctrine. However, before considering the matter of alleged trial errors, we will consider the contention of defendant that the judgment must, in any event, be affirmed because plaintiff failed to make a submissible case. In determining that question we will view the evidence in the light most favorable to plaintiff.

The testimony herein primarily concerns an open area of approximately two square blocks located near the center of Joplin, Missouri. The area is bounded on the north by the 7th Street overpass, on the south by 9th Street, and on the east and west respectively by Minnesota and Missouri Avenues. In describing this area certain references to distances and directions are approximate.

The main-line tracks and industrial switches of the Frisco railroad run north and south along the west side of the area. A little more than 100 feet east of the main line of the Frisco is a small branch called Joplin Creek. This branch has sloping sides riprapped with rock. About 100 feet east of Joplin Creek is the main-line track of the defendant running north and south. This line has a grade crossing at 9th Street and goes under the 7th Street overpass. The casualty in question occurred on one of defendant's industrial tracks referred to as the Rothschild spur. This spur track runs just east of the defendant's main line beginning at a switch 300 feet north of 9th Street and extending almost to 7th Street. It serves the business referred to in the evidence as the Rothschild junk yard

which occupies a rather large tract of land on the east side of the area in question. There is a fence along the west side of the Rothschild property extending along the spur track in question.

Plaintiff, who was 53 years of age at trial time, was injured shortly before noon on Saturday, May 9, 1953. He was an itinerant house-to-house peddler selling such items as combs and razor blades. He admitted that alcohol had become a problem with him about the year 1946 and that during periods of time in 1951 and 1952 he had been a patient in a state hospital in Indiana for treatment as an alcoholic. He stated that after leaving the hospital he no longer drank heavily but would have a few beers each day. On May 8 he had hitchhiked from Ft. Smith, Arkansas, to Joplin, arriving late in the afternoon. He testified that on the morning of May 9 he ate breakfast and thereafter drank two beers; that he desired to work that day in an area occupied largely by "working people"; that in order to reach such an area, in response to directions given him, he went to the 7th Street viaduct and started south along the defendant's main-line track; that he looked up and saw a train coming north on the main line near the crossing (9th Street) and that he therefore walked across the main line onto the Rothschild spur track; that there were two coal cars standing on the spur track and he passed eight or ten feet north of the north car; that as he crossed the spur track he "became faint, nauseated, a little sick at my stomach" and consequently stood on the track for 1½ or 2 minutes; that he then began to feel better and started to go on across the spur intending to walk along the east side of the cars, but before he had crossed the east rail "something hit me" and it seemed like he was being "rolled and drug," and he lost consciousness. He had heard no whistle or bells from any engine prior to being struck.

It was obvious from plaintiff's condition when found that his left leg had been run over by one of the freight cars on the siding. The leg was crushed from the ankle

to a point above the knee and the injured portion of the leg, held only by some skin, was removed in the emergency room of the hospital. Plaintiff also received injuries to his spine and, after spending nine months in Freeman Hospital at Joplin, had a spinal operation and several operations upon his leg for "stump revision" in various hospitals located in the State of Indiana where his mother and brother lived.

Millard Dennison testified that he was employed by the defendant as a fireman and on May 9, 1953, was working on a switch crew; that just prior to the casualty in question he was operating the switch engine which was going north on defendant's main line; that when the engine neared the 9th Street crossing he blew the whistle and turned on the bell, but that the bell was turned off just after the engine crossed 9th Street and no further warning was given prior to the time plaintiff was injured; that as the engine neared the switch stand for the Rothschild spur it was stopped and brakeman Smith lined the switch; that the engine then moved down the spur and coupled onto the two cars thereon; that the cars did not move toward the north when the coupling was made because the engine stopped at the point of coupling; that he then pulled the two cars southwardly out on the main line and was preparing to take them north on that track when he looked up and saw an injured man lying just east of the east rail on the Rothschild spur; that he immediately notified the other members of the crew, one of whom called the ambulance.

Plaintiff's version of the manner in which the casualty occurred is corroborated somewhat by the testimony of Russell Lindley. Mr. Lindley testified that he lived on 9th Street and could see the Rothschild spur from his front porch; that he was sitting on the porch at the time of the occurrence and saw a man walking south down the defendant's track and as he neared the two cars standing on the spur he turned eastwardly and went in behind those cars; that from the time this man went behind the

coal cars until the time they were coupled onto the engine "it couldn't have been over a couple of minutes at the most"; that when the coupling was made the cars moved to the north for a distance of from fifteen to twenty feet.

Harold Griffith also lived near the spur in question. He testified that he was working in his front yard at the time of the instant occurrence and looked up when he heard a loud "boom" when the defendant's engine coupled onto the cars on the spur and at that time saw the cars moving toward the north; that he then turned his attention to his work and shortly thereafter heard the siren of the ambulance which came to take plaintiff to the hospital.

Four members of the switching crew testified and all of them denied seeing any man walk from the main line into a position behind the cars on the spur track.

Defendant presented the evidence of a police officer who testified that he talked with the plaintiff before the ambulance arrived and that plaintiff stated that he had been sleeping. To further develop that theory of its defense defendant offered the testimony of B. E. Burton, an employee in defendant's Joplin ticket office, who testified that he examined the scene shortly after plaintiff was injured and found an indentation in the grass along the east side of the spur track; that there was some blood within a foot or two of this indentation and more blood on the ties about ten or twelve feet south of that point. This witness testified that he also examined the coal cars that had been standing on the track in order to determine the parts of the cars involved and found blood stains on the north trucks of the south car with a spatter of blood on the first wheel of the south trucks on the north car.

Plaintiff's case was submitted upon the primary negligence of defendant, its agents and employees, in failing to keep a lookout and failing to warn plaintiff of the approach of the engine and the movement of the cars in the coupling operation. Defend-

ant pleaded that plaintiff was a 'trespasser and has contended in the trial court and here that its employees were not under any duty to keep a lookout for persons on the Rothschild spur. Plaintiff contends that the "clear track" doctrine is not applicable in this case because of general public user of the Rothschild spur and the surrounding area. The court submitted the issue of public user to the jury but defendant contends that the evidence was not sufficient to support that submission and hence plaintiff failed to make a submissible case.

"It is fundamental law that a railroad's right to the use of its yards and tracks therein is paramount and exclusive, and for that reason they are presumably entitled to a clear track. However, the right to a clear track may be waived where evidence of user of the track by pedestrians is such that it tends to show that the railroad knew of and acquiesced therein. Frye v. Railroad, 200 Mo. 377, 399, 98 S.W. 566, 8 L.R.A.,N.S., 1069." Crossno v. Terminal R. Ass'n of St. Louis, 333 Mo. 733, 62 S.W.2d 1092, 1093. The rule is stated in Hoops v. Thompson, 357 Mo. 1160, 212 S.W.2d 730, 731, as follows: "A railroad generally has the exclusive right to the use of its tracks. However, it has no right to expect a clear track at public crossings or at other places where it has actual or constructive notice that people are habitually using its track. To constitute constructive notice of such user, the use must be open and constant over such period of time as to raise the presumption that it is known to the employees of the railway. At places where there is no right to expect a clear track the railroad must keep a vigilant look-out; at all other places the railroad is liable only when its employee actually sees a person in danger in time, with the means at hand and with safety to himself and others in his charge, to avoid injuring such person." The "clear track" doctrine is rather strictly applied in regard to tracks located in rural areas where there are few inhabitants but it is significant in the case at bar that "User at a place where there is a very con-

siderable population living adjacent to the tracks in a city, or even a work camp, mine or industry, is essentially different from user in open sparsely settled county [country] districts outside city limits." Cochran v. Thompson, 347 Mo. 649, 148 S.W.2d 532, 536.

A number of witnesses testified concerning the use by the public of the area in question. We will not detail the testimony of each witness but will attempt to summarize the facts shown by that testimony. In so doing we will first consider the general area heretofore described and thereafter the specific use of the spur upon which plaintiff was injured. There was evidence of the following facts:

1. As to the area in general: (a) The area is located in the heart of Joplin, Missouri. To the north and west lies the main business district of the city. There are many dwellings close by the area on the south and east. (b) The area was not enclosed and it does not appear that defendant had made any effort to restrict its use by the public. (c) There is a well-defined path across the southeast corner of the area which extends from 9th Street to Minnesota Avenue and which crosses the defendant's main line about 90 feet north of 9th Street. (d) Children play baseball in the part of the tract lying just north of 9th and between Joplin Creek and defendant's main line. They also use the area to fly their kites. (e) At the appropriate time of the year women pick greens between the tracks of defendant and Frisco "all around in there." (f) There was an abundance of evidence that people frequently used the main line of defendant at all times of the day in going between 9th and 7th Streets. They walked in both directions, between the rails, and also along each side of the tracks.

2. As to the use of the Rothschild spur: (a) Near the north end of the spur children had for years picked up scrap that had been dropped in the process of loading cars and would take it "around and sell it to them again." (b) There was a pathway visible

along each side of the spur track. (c) Witness Lindley testified as follows: "Q. How many other people than this man you have described in detail did you see walking up and down the spur that morning? A. Well, I didn't make a count of them. I seen quite a few people coming up and down that track like they do every day." Witness West testified that he had walked "up and down" the spur and Mr. Griffith testified that he had walked on both the main line and the spur.

■ A consideration of the foregoing evidence, together with the rules heretofore quoted, has convinced us that the evidence was sufficient to warrant the submission of the issue as to the waiver of defendant of its right to expect a clear track upon the spur in question. See also Wise v. Chicago, R. I. & P. Ry. Co., 335 Mo. 1168, 76 S.W.2d 118, Dalton v. Missouri, K. & T. Ry. Co., 276 Mo. 663, 208 S.W. 828, and Burnam v. Chicago Great Western R. Co., 340 Mo. 25, 100 S.W.2d 858.

Defendant also contends that even though user was shown plaintiff did not make a submissible case because the evidence showed that defendant was not negligent. In that connection defendant says (1) that the members of the crew all testified that they were looking to the north and did not see plaintiff; (2) that if plaintiff was standing eight or ten feet north of the north car (as he testified) he could not have been seen by members of its crew as the engine approached the cars; and (3) all of the crew members testified that it was not the custom and practice to inspect under or at the far end of the cars standing on a spur track before coupling onto them. It is therefore argued that even though defendant's employees had kept a reasonable and diligent lookout they could not have seen plaintiff and hence were under no duty to warn.

We do not agree with the foregoing contention. Our view is that it is not based upon the proper factual hypothesis. From the evidence favorable to plaintiff the jury reasonably could have found the facts stated in the remainder of this paragraph: As the engine crossed 9th Street the crew had a clear view of defendant's main line at least as far as the 7th Street overpass and of the cars standing on the spur. If they had been keeping a reasonably careful lookout ahead they could have seen plaintiff walk across the main-line tracks and go behind the north end of the north car standing on the spur. That was 1½ or 2 minutes before they coupled the engine onto the cars and moved them forward fifteen or twenty feet. As the engine approached the standing cars and the members of the crew did not see plaintiff in a position of safety they had notice of the fact that he might be in a position of danger of being struck by the cars and hence should have given a warning of some kind of the approach of said engine prior to the movement of said standing cars. It was admitted by the operator of the engine that no warning was given after the engine crossed 9th Street which was 600 feet from the place where plaintiff was injured. For the reasons stated we rule that plaintiff made a submissible case upon the failure of defendant to use ordinary care to keep a careful lookout and to warn.

■ While defendant does not specifically assign it as a point relied upon, the statement is made in the argument that plaintiff was guilty of contributory negligence as a matter of law in standing behind the cars where he could not see to the south when he had seen an engine approaching shortly before that time. In that connection it will be remembered that there was evidence to indicate that plaintiff saw the engine on the main line and then changed his course and started across the spur apparently seeking a place of safety and that he stopped on that track because he became suddenly ill. Under those circumstances the issue as to his contributory negligence was for the jury.

As another basis for its contention that plaintiff failed to make a submissible case defendant states that the personal testimony of plaintiff should be disregarded because

it "was incredible, contrary to physical facts, and unworthy of belief." It is obvious from a review of plaintiff's testimony that there is no merit in that contention. We find nothing therein that is incredible or contrary to physical facts. The weight to be accorded his testimony was for the jury to determine. The point is disallowed.

■ Plaintiff contends that the court erred in giving Instruction No. 8 at the request of defendant. It reads as follows: "The court instructs the jury that if you find and believe from the evidence that on the occasion mentioned in evidence the actions of plaintiff Banford C. Counts were the sole cause of his injuries and that such injuries were not due to any negligence on the part of the defendant in any of the particulars set forth in other instructions given you by the court, then plaintiff is not entitled to recover and your verdict must be for the defendant." Plaintiff says that said instruction is erroneous because it does not hypothesize any facts in evidence which would create a sole cause situation or entitle the defendant to a verdict.

The instruction complained of is clearly erroneous for the reason stated by plaintiff. We have uniformly held that instructions of that type should hypothesize the facts which, if true, would show that the plaintiff has no right to recover. See Stanich v. Western Union Tel. Co., 348 Mo. 188, 153 S.W.2d 54, and cases cited therein. In the Stanich case we held a very similar instruction to be reversibly erroneous because the facts were not hypothesized therein. In so ruling we stated, " * * * a lawsuit should at some time be reduced to and decided upon definite and certain issues. In a jury trial the time for specifying fact issues is, at least, when the case is submitted to the jury. Only by so doing can it be possible for the jury to perform its proper function of deciding the facts of the case. If juries are to be required to decide cases on the fact issues actually developed in the trial, there can be no escape from the logic of this opinion (Watts v. Moussette, supra

[337 Mo. 533, 85 S.W.2d 487]) requiring that such facts, as they must determine favorably in order to decide for defendant, on either a plaintiff's or a third party's sole cause negligence, must be stated in the instruction authorizing such a verdict. * * [S]ubmitting such a defense * * * upon an abstract general legal proposition * * would give the jury a roving commission as to facts and permit them to pass upon a question of law according to any theory they could construct or evolve in their own minds." 153 S.W.2d loc. cit. 57, 58.

Defendant seeks to avoid the application of the rule stated in the Stanich case by pointing out that the instruction therein required a finding of "negligent" sole cause acts, whereas the instant instruction permitted the sole cause finding to be based upon any "actions of plaintiff." That distinction is of no consequence herein. The principle involved in the rule heretofore quoted is that the *facts* upon which the jury may base a finding that the conduct of plaintiff (or a third party) was the sole cause of the casualty must be hypothesized in the instruction. Those facts must be stated regardless of whether they disclose "actions of plaintiff" that are negligent or non-negligent.

It is also defendant's contention that the failure of the instruction to contain a hypothesization of the facts was not reversible error because the "evidence did not show two versions of what plaintiff's actions were on the occasion mentioned in evidence. He testified as to what his actions were and was somewhat supported by Lindley * * * [and] there was no conflicting testimony as to what his actions were or to 'another state of facts.' " We are unable to understand that contention. Defendant presented evidence which would warrant a finding that plaintiff was asleep on or near the track and was lying under the south car on the switch track. Moreover, defendant in another instruction submitted as a defense the fact that plaintiff "was lying down beside, underneath or in dangerous proximity to said cars." That certainly conflicts

with plaintiff's version of the manner in which the casualty occurred. In that connection the defendant also says that under the rule stated in Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, if plaintiff thought a more complete or detailed submission was necessary he should have offered a clarifying or amplifying instruction. That contention is without merit. The rule stated in the Hooper case has no application to an instruction which fails to hypothesize *any* facts. Certainly it was not plaintiff's duty to review the evidence favorable to defendant and determine what actions of his should be submitted to the jury as a basis for a finding (and consequent defendant's verdict) that the "actions of plaintiff were the sole cause of his injuries."

Defendant's final point in defense of Instruction No. 8 is that any omission in factual hypothesization was cured by the fact that the instruction referred the jury to other instructions. It is pointed out that defendant's contributory negligence Instruction No. 6 hypothesized facts (supported by the evidence) which would have warranted a finding that plaintiff's actions were the sole cause of his injuries. The difficulty with that argument is that in Instruction No. 8 the jury was referred to other instructions in order to determine whether any negligence of defendant was the cause of plaintiff's injuries and not for a determination of the facts upon which to base a finding that plaintiff's actions were the sole cause thereof. The contention is therefore without merit.

■ Plaintiff contends that the court erred in refusing to give Instruction No. 20 offered by him. That instruction, after requiring a finding of user, submitted plaintiff's claim upon the humanitarian theory that after plaintiff went upon the spur defendant's employees saw or could have seen him in a position of imminent peril in time thereafter "to have stopped its engine before coupling into the two aforementioned standing freight cars and before causing said freight cars to strike plaintiff, if so, or

to have sounded an audible warning to plaintiff of its intention to so couple."

Plaintiff in his brief bases his contention of humanitarian submissibility solely upon the premise that he was in a position of imminent peril at the time he walked onto the spur track and that defendant's employees by the exercise of ordinary care could have seen him go behind the standing cars and at that time could have prevented the injury by stopping the engine or sounding a warning. The difficulty with that contention is that plaintiff was not in a position of imminent peril at that time. Under plaintiff's testimony at least 1½ minutes elapsed between the time he went behind the car and the time he was struck. He had obviously intended to walk on across the spur and no doubt would have done so but for the fact that he became ill. During the period plaintiff was on the track the engine came to a stop while the switch was being lined. Clearly plaintiff was not in a position of imminent peril at the time he went upon the spur and hence the trial court did not err in refusing that instruction.

Undoubtedly plaintiff was in a position of imminent peril at some time before he was struck but plaintiff does not attempt to point out when that occurred or to demonstrate, under the evidence, that defendant knew or should have known thereof and could thereafter have safely taken the hypothesized action to avoid injuring him. Since the theory briefed by plaintiff is unsound and no other is suggested by him, we do not care to speculate as to possible theories of humanitarian liability that may be supported by evidence appearing in this record or evidence that may be offered at another trial. We therefore do not foreclose the possibility that upon another trial plaintiff might be entitled to a humanitarian submission in the event an appropriate instruction, supported by the evidence in that trial, is offered by him.

We deem it unnecessary to extend this opinion by a discussion of the alleged error of the court in giving Instruction No. 10 at

the request of defendant. Prior to another trial counsel for defendant will have the opportunity to consider the advisability of offering an instruction of that nature and, if they decide to do so, will no doubt reexamine that instruction and make such corrections therein as may be considered necessary, in view of the attack made thereon by plaintiff.

The judgment is reversed and cause remanded for a new trial.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.